209 P.3d 1260 (2009)
HAWAII MEDICAL SERVICE ASSOCIATION, Respondent-Appellant-Appellant,
v.
Patricia E.G. ADAMS, in her capacity as Personal Representative of the Estate of Brent Adams, Petitioner-Appellee-Appellee, and
The Insurance Commissioner, and the Division of Insurance, of the Department of Commerce and Consumer Affairs, State of Hawaii, Appellees-Appellees.
No. 28899.
Intermediate Court of Appeals of Hawai`i.
May 21, 2009.
As Amended May 22, 2009.
*1262 Dianne Winter Brookins (Ellen Godbey Carson and Jason H. Kim with her on the briefs) (Alston Hunt Floyd & Ing), Honolulu, for Appellant Hawaii Medical Service Association.
Rafael G. Del Castillo (Arleen D. Jouxson with him on the brief) (Jouxson-Meyers & Del Castillo), Wahiawa, for Appellee Patricia E.G. Adams, in her capacity as Personal Representation of the Estate of Brent Adams.
David A. Webber, Deputy Attorney General (Deborah Day Emerson, Deputy Attorney General, with him on the brief), for Appellees The Insurance Commissioner and the Division of Insurance of the Department of Commerce and Consumer Affairs, State of Hawaii.
WATANABE, Acting Chief Judge, FOLEY and FUJISE, JJ.
*1263 Opinion of the Court by FOLEY, J.
Respondent-Appellant-Appellant Hawaii Medical Service Association (HMSA) appeals from the Judgment filed on November 13, 2007 in the Circuit Court of the First Circuit (circuit court).[1] The circuit court affirmed the "Findings of Fact, Conclusions of Law, Discussion and Order" (Discussion and Order) filed on April 18, 2007 with the State of Hawai'i Department of Commerce and Consumer Affairs (DCCA) Insurance Division by the DCCA Insurance Commissioner (the Commissioner), pursuant to Hawaii Revised Statutes (HRS) § 432E-6 (2005 Repl.), and signed by the Commissioner. In the Discussion and Order, a three-member external review panel (the Panel), appointed by the Commissioner, reversed HMSA's February 23, 2007 final determination, in which HMSA denied coverage of an allogeneic stem-cell transplant (allo-transplant)[2] for Petitioner-Appellee-Appellee Brent Adams[3] (Adams) to treat his multiple myeloma.[4]
On appeal, HMSA contends the circuit court erred by (1) applying the "palpably erroneous" standard of review to the entirety of the Discussion and Order; (2) affirming the Panel's interpretation of HRS § 432E-1.4 (2005 Repl.) as requiring HMSA to have specifically identified allo-transplant "for treatment of multiple myeloma" in Chapter 6, "Services Not Covered," of its Preferred Provider Plan for the Hawai'i Employer-Union Health Benefits Trust Fund (the Plan) in order to specifically exclude coverage for such service; (3) concluding that the Panel could consider a study that had been unavailable to HMSA during HMSA's internal review in determining that HMSA had acted unreasonably in denying coverage for an allo-transplant under HRS § 432E-6(a)(7); and (4) affirming the Discussion and Order's conclusion that HMSA breached its implied covenant of good faith and fair dealing when it denied coverage for a lifesaving treatment on the basis that there was no scientific study proving the treatment was beneficial and refused to reconsider such denial when presented with a scientific study, published after the denial.
We vacate the Judgment and remand to the circuit court with instructions to reverse the Discussion and Order and enter judgment on behalf of HMSA.

I.
Adams was an HMSA member under the Plan. Adams was diagnosed in 2005 with multiple myeloma and treated with the drugs Thalidomide and Decadron in August 2005. City of Hope, a research and treatment hospital in Duarte, California, requested pre-authorization for a tandem autologous bone marrow transplant (auto-transplant) for Adams. HMSA approved the request on December 21, 2005. An auto-transplant involves the harvesting and transplantation of the patient's own stem cells. In January 2006, Adams received his first auto-transplant. After HMSA denied coverage in March 2006 for an allo-transplant, Adams returned to City of Hope in April 2006 and received a second auto-transplant. Adams then suffered a relapse of his condition and was treated with the drugs Revlimid and Decadron.
On or about February 7, 2007, HMSA received from City of Hope another request for pre-authorization of an allo-transplant for Adams. The donor was to be Adams's sister. By Notice of Medical Denial dated February 14, 2007, HMSA denied that request as "investigational."[5] HMSA's denial was based *1264 on existing medical literature, as summarized in a guideline published by Blue Cross Blue Shield Association (BCBSA) in 1998 and updated as of July 2006 (BCBSA Guideline). The BCBSA Guideline was numbered 8.01.17 and titled "Single or Tandem Courses of High-Dose Chemotherapy Plus Hematopoietic Stem-Cell Support for Multiple Myeloma." HMSA had adopted the BCBSA Guideline as its medical policy.
The BCBSA Guideline was based on research and medical literature reviews performed by the Technology Evaluation Center (TEC) of the BCBSA. The TEC assessments evaluate whether drugs, devices, procedures, and biological products improve health outcomes such as length of life, quality of life, and functional ability.[6]
The BCBSA Guideline addresses single or tandem courses of high-dose chemotherapy plus hematopoietic stem-cell support for multiple myeloma. The BCBSA Guideline states that "[m]onotherapy using high-dose chemotherapy with allogeneic stem-cell support is considered investigational, either as initial therapy of multiple myeloma, or after a prior failed course of high-dose chemotherapy and autologous stem-cell support." The BCBSA Guideline notes in its update (based on a review in 2006 of medical literature) that "since no new controlled trials investigated the role of tandem [auto-transplants] or [allo-transplants], these policy statements remain unchanged." The BCBSA Guideline as a whole is supported by references to thirty-four studies and articles from medical journals.
On February 20, 2007, Adams's treating physician, Anthony Stein, M.D., (Dr. Stein) requested an appeal of HMSA's denial of pre-authorization for the allo-transplant and *1265 provided three abstracts of medical studies authored by Arora, et al. (Arora Study); Crawley, et al. (Crawley Study); and Reynolds, et al. (Reynolds Study).
HMSA referred the appeal to one of its medical directors, Melvin Inamasu, M.D., (Dr. Inamasu) an oncologist and assistant professor at the University of Hawai'i John A. Burns School of Medicine and a clinical consultant to HMSA. Dr. Inamasu reviewed the appeal on or about February 21, 2007.
In a February 23, 2007 letter to Dr. Stein, Dr. Inamasu issued HMSA's final internal determination, upholding the denial of pre-authorization for the allo-transplant. The letter stated that because multiple myeloma was not listed in the Plan as a condition for which an allo-transplant would be covered, an allo-transplant to treat Adams's condition was excluded from coverage under the Plan.
Chapter 6 of the Plan, "Services Not Covered," specifically excludes coverage for transplant services and supplies other than those described in Chapter 4:
You are not covered for transplant services or supplies or related services or supplies other than those described in Chapter 4: Description of Benefits under Organ and Tissue Transplants. Related Transplant Supplies are those that would not meet payment determination criteria but for your receipt of the transplant, including, and without limitation, all forms of bone marrow or peripheral stem cell transplants.
(Underlined emphasis not in original.) Chapter 4 lists a number of conditions for which allo-transplant is covered. The list does not include multiple myeloma.
The February 23, 2007 letter also reiterated the original finding that based on the current medical literature, use of an allo-transplant to treat multiple myeloma "did not improve health outcomes." In connection with the appeal, Dr. Inamasu considered the three articles referenced in the abstracts provided by Dr. Stein. The medical literature submitted by Dr. Stein, to the extent it is relevant at all, indicated that an allo-transplant was not likely to be effective for treatment of Adams's multiple myeloma, which had already failed other therapies. The article by Dr. Crawley commented that "[r]eserving this treatment for patients in whom other therapies have failed is unlikely to result in beneficial outcomes. The best outcomes were seen in patients who received a transplant in remission and earlier in the course of the disease." The Crawley Study also identified two relative-risk factors for transplantation-related mortality, which measures the percentage of patients who die as a result of the transplant itself. Those relative-risk factors were (1) female-to-male donation and (2) transplantation more than one year after diagnosis. Both of those relative-risk factors were present in Adams's case. The transplantation-related mortality for all patients at one year from transplant in the Crawley study was 22%.
There is no indication that either the Reynolds study or the Arora study included individuals, such as Adams, who had failed two previous transplants. Dr. Reynolds concluded that there was no benefit to an allo-transplant when the data was adjusted for factors such as age and disease status and that "[a]lthough there was a suggestion that progression-free survival was improved with an [allo-transplant], it did not achieve statistical significance."
Dr. Inamasu's determination to uphold the denial, based upon the BCBSA Guideline, was consistent with the National Comprehensive Cancer Network Clinical Practice Guidelines for multiple myeloma. As of 2007, these guidelines stated that the only recommended use of allo-transplant to treat multiple myeloma was in a clinical trial setting. HMSA received no indication in Dr. Stein's request for pre-authorization or appeal that Adams was to be enrolled in a clinical trial. After HMSA's final internal determination, City of Hope confirmed that Adams would not be in a clinical trial.
On March 13, 2007, Adams filed a request with the DCCA Insurance Division for an expedited external review of HMSA's denial of pre-authorization for an allo-transplant to treat his multiple myeloma.
On March 22, 2007, the day before the external review hearing, Adams submitted to the Commissioner an article from the March *1266 15, 2007 edition of the New England Journal of Medicine (the NEJM article). Adams also submitted a March 16, 2007 letter in which Dr. Stein stated that after Adams's case had been presented to eleven City of Hope doctors at a "New Patient Conference," the doctors had agreed that an allo-transplant was the appropriate treatment for Adams. Because HMSA had issued its final denial decision on February 23, 2007, HMSA could not have considered these documents in making its decision.
On March 23, 2007, the Panel conducted a hearing pursuant to HRS § 432E-6 on Adams's request for external review. On March 27, 2007, the Commissioner issued a Notice of Proposed Order and advised the parties that the Panel had recommended that the final internal determination issued by HMSA be reversed and HMSA be ordered to provide coverage for an allo-transplant, as requested by Dr. Stein. HMSA approved the coverage, and Adams received the allo-transplant.
On April 18, 2007, the Commissioner issued the findings and conclusion of the Panel in the Discussion and Order. The Panel found that an allo-transplant "for multiple myeloma is not a covered benefit under the Plan" and a "reasonable person reviewing the Plan language could readily determine that an [allo-transplant] was not a covered benefit." Nonetheless, the Panel concluded that HMSA's exclusion under the Plan of an allo-transplant for treatment of multiple myeloma was not specific enough because the exclusion "is not specifically enumerated as an excluded benefit in Plan Chapter 6: Services Not Covered."
The Panel also concluded that HMSA "acted unreasonably in denying [Adams's] request for coverage because [HMSA] did not properly apply the definition of `medical necessity' in HRS § 432E-1.4" and HMSA breached the implied covenant of good faith and fair dealing by "[d]enying coverage for a lifesaving treatment on the basis that there was no scientific study proving that the treatment was beneficial and refusing to reconsider such denial when presented with a scientific study, published after the denial, that shows that the treatment requested is beneficial." The Panel reversed HMSA's final internal determination.
The Commissioner later granted in part HMSA's April 27, 2007 Motion for Partial Reconsideration and made one substantive change and one citation change to the Discussion and Order.
On May 18, 2007, HMSA appealed the Discussion and Order, as amended, to the circuit court. After a hearing, the circuit court, on November 13, 2007, issued its "Decision and Order Affirming the Findings of Fact, Conclusions of Law, Discussion and Order, Filed April 18, 2007, as Amended by the Order Granting in Part and Denying in Part [HMSA's] Motion for Partial Reconsideration filed April 27, 2007, and Reversing in Part Findings of Fact No. 18 and 23" (Order). The circuit court affirmed the Findings of Fact (FOFs) and Conclusions of Law (COLs) in the Discussion and Order, as amended, with one exception  the circuit court reversed in part FOFs 18 and 23 to the extent they were premised on "a separate formal request by Dr. Stein to HMSA for reconsideration of its final internal determination based upon the NEJM article." The circuit court determined that the record lacked evidence to support a finding that any such request was made.
The circuit court entered the Judgment on November 13, 2007. On December 13, 2007, HMSA timely filed its appeal.

II.

A. Administrative Agency Decisions-Secondary Appeals
"`Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which [the appellate] court must determine whether the court under review was right or wrong in its decision.'" Leslie v. Bd. of Appeals of County of Hawaii, 109 Hawai'i 384, 391, 126 P.3d 1071, 1078 (2006) (quoting Lanai Co., Inc. v. Land Use Comm'n, 105 Hawai'i 296, 306-07, 97 P.3d 372, 382-83 (2004) (other citation omitted)). The standards as set forth in HRS § 91-14(g) (1993) are applied to the agency's decision. Ka *1267 Pa'akai O Ka'aina v. Land Use Comm'n, 94 Hawai'i 31, 40, 7 P.3d 1068, 1077 (2000). HRS § 91-14(g) provides:
(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"`Under HRS § 91-14(g), [COLs] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); [FOFs] under subsection (5); and an agency's exercise of discretion under subsection (6).'" Sierra Club v. Office of Planning, State of Hawai'i, 109 Hawai'i 411, 414, 126 P.3d 1098, 1101 (2006) (quoting In re Hawaiian Elec. Co., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (other citation omitted)).
"`An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.'" Poe v. Hawai'i Labor Relations Bd., 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (quoting Kilauea Neighborhood Ass'n v. Land Use Comm'n, 7 Haw.App. 227, 229-30, 751 P.2d 1031, 1034 (1988)). "`[T]he courts may freely review an agency's [COL].'" Lanai Co., 105 Hawai'i at 307, 97 P.3d at 383 (quoting Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (other citation omitted)). "Abuse is apparent when the discretion exercised clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." Kimura v. Kamalo, 106 Hawai'i 501, 507, 107 P.3d 430, 436 (2005) (internal quotation marks and citation omitted).
Brescia v. North Shore Ohana, 115 Hawai'i 477, 491-92, 168 P.3d 929, 943-44 (2007) (some brackets in original and some added).
A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.
Igawa v. Koa House Rest., 97 Hawai'i 402, 406, 38 P.3d 570, 574 (2001) (internal quotation marks, citations, and brackets omitted) (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)).

B. Deference to Administrative Agencies
[W]hen reviewing a determination of an administrative agency, we first decide whether the legislature granted the agency discretion to make the determination being reviewed. If the legislature has granted the agency discretion over a particular matter, then we review the agency's action pursuant to the deferential abuse of discretion standard (bearing in mind the legislature determines the boundaries of that discretion). If the legislature has not granted the agency discretion over a particular matter, then the agency's conclusions are subject to de novo review.
Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 419-20, 91 P.3d 494, 501-502 (2004).

C. Statutory Interpretation
As the Hawai'i Supreme Court recently observed:

*1268 First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of the City and County of Honolulu, 114 Hawai'i 184, 193-94, 159 P.3d 143, 152-53 (2007) (quoting Peterson v. Hawaii Elec. Light Co., Inc., 85 Hawai'i 322, 327-28, 944 P.2d 1265, 1270-71 (1997), superseded on other grounds by HRS § 269-15.5 (Supp.1999)).
....
... [A]nother well-established rule of statutory construction is that "where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." Aio v. Hamada, 66 Haw. 401, 407, 664 P.2d 727, 731 (1983) (quoting Treloar v. Swinerton & Walberg Co., 65 Haw. 415, 424, 653 P.2d 420, 426 (1982)); accord Haole v. State of Hawai'i, 111 Hawai'i 144, 150, 140 P.3d 377, 383 (2006).
Right to Know Comm. v. City Council, City & County of Honolulu, 117 Hawai'i 1, 12-13, 175 P.3d 111, 122-23 (App.2007).

III.
HRS § 432E-1.4(a) provides that for contractual purposes, a health intervention shall be covered
if it is an otherwise covered category of service, not specifically excluded, recommended by the treating licensed health care provider, and determined by the health plan's medical director to be medically necessary as defined in subsection (b). A health intervention may be medically indicated and not qualify as a covered benefit or meet the definition of medical necessity.
Under the foregoing language, health care plans must provide coverage for a health intervention that meets the definition of "medical necessity" in HRS § 432E-1.4 if the health intervention is an "otherwise covered category of services, not specifically excluded." HRS § 432E-1.4(a). If a service is "specifically excluded" from coverage, the plan is not required to perform the statutory medical-necessity analysis and is not required to cover the "specifically excluded" services no matter how medically necessary the health intervention may be. Thus, if the Plan language in the instant case "specifically excluded" from coverage the requested allo-transplant for treatment of Adams's multiple myeloma, HMSA had no obligation to provide coverage, regardless of the Panel's finding that the required service was medically necessary. Whether the Panel properly interpreted the Plan as requiring coverage for Adam's allo-transplant because such treatment was "not specifically excluded" from coverage is a conclusion of law, which is freely reviewable by this court. In re Wai'ola O Moloka'i, Inc., 103 Hawai'i 401, 421, 83 P.3d 664, 684 (2004).
We conclude that the Plan language "specifically excluded" an allo-transplant as a treatment for multiple myeloma. Chapter 6 of the Plan sets forth various categories of procedures, services, and supplies excluded under the Plan.

A.
The relevant provisions of Chapter 6, entitled "Services Not Covered," are as follows:
About this Chapter
Your health care coverage does not provide benefits for certain procedures, services, or supplies that are listed in this chapter. For your convenience, we divided *1269 this chapter with category headings. These category headings will help you find the information you are looking for. Actual exclusions are listed across from category headings.

Please note: Even if a service or supply is not specifically listed as an exclusion, it will not be covered unless it is described in Chapter 4: Description of Benefits, and it meets all of the criteria described in Chapter 1: Important Information under Questions We Ask When You Receive Health Care.

* * *
Transplant Services or Supplies You are not covered for transplant services or supplies or related services or supplies other than those described in Chapter 4: Description of Benefits under Organ and Tissue Transplants. Related Transplant Supplies are those that would not meet payment determination criteria but for your receipt of the transplant, including, and without limitation, all forms of bone marrow or peripheral stem cell transplants.
The relevant provisions of Chapter 4, entitled "Description of Services" are as follows:
Important Bone Marrow Transplant Definitions Allogeneic and Autologous Bone Marrow Transplants mean medical and/or surgical procedures composed of several steps or stages including, without limitation:
&lhblk; The harvest of stem cells from the blood or bone marrow of a third-party donor ("allogeneic") or from the patient ("autologous")[.]
&lhblk; Processing and/or storage of harvested stem cells.
&lhblk; The administration of high dose chemotherapy and/or high dose radiation therapy. High Dose Chemotherapy and High Dose Radiation Therapy are forms of therapy in which the dose and/or manner of administration is expected to damage a person's bone marrow or suppress bone marrow function so that a bone marrow transplant is required or warranted.
&lhblk; The infusion of harvested stem cells.
&lhblk; Hospitalization, observation, and management of reasonably anticipated complications such as graft versus host disease, infections, bleeding, organ or system toxicities, and low blood counts.
This definition specifically includes transplants when the transplant component is derived from circulating blood instead of, or in addition to, harvest directly from the bone marrow. This definition further specifically includes all component parts of the procedure including, without limitation, high dose chemotherapy and/or high dose radiation therapy.
Allogeneic Bone Marrow Transplants Covered, but only with our approval. See Chapter 5: Precertification. Allogeneic bone marrow transplants are available only for treatment prescribed for the following conditions:
&lhblk; Acute lymphocytic or nonlymphocytic (i.e., myelogenous) leukemia.
&lhblk; Advanced stage Hodgkin's disease.
&lhblk; Advanced stage, intermediate-grade, or high-grade non-Hodgkin's lymphoma.
&lhblk; Advanced stage neuroblastoma.
&lhblk; Chronic myelogenous leukemia that is in blast crisis or chronic phase.
&lhblk; Gonadal germ cell tumors.
&lhblk; Homozygous beta-thalassemia.
&lhblk; Infantile malignant osteopetrosis.
&lhblk; Lysomal storage diseases.
&lhblk; Myelodyspastic syndrome.
&lhblk; Severe aplastic anemia.
&lhblk; Severe combined immunodeficiency syndrome.
&lhblk; Wilm's tumor.
&lhblk; Wiskott-Aldrich syndrome.

*1270 Autologous Bone Marrow Transplants Covered, but only with our approval. See Chapter 5: Precertification. Also, benefits for autologous bone marrow transplants are limited to treatment prescribed for the following conditions:
&lhblk; Acute lymphocytic and non-lymphocytic (i.e., myelogenous) leukemia.
&lhblk; Advanced stage intermediate-grade or high-grade non-Hodgkin's lymphoma.
&lhblk; Advanced stage Hodgkin's disease.
&lhblk; Advanced stage neuroblastoma.
&lhblk; Breast cancer.
&lhblk; Gonadal germ cell tumors.
&lhblk; Multiple myeloma if in accord with our criteria, the disease is newly diagnosed or responsive to previous treatment for multiple myeloma.
&lhblk; Wilm's tumor.
Chapter 6 refers to and incorporates by reference provisions of Chapter 4.
Chapter 4 clearly limits benefits for bone marrow transplants to auto- and allo-transplants "for the specified diseases or conditions described in this section." Under the category of "Allogeneic Bone Marrow Transplants," Chapter 4 lists fourteen specific diseases or conditions for which an allo-transplant is a covered procedure. This list does not include multiple myeloma.[7] The Plan thus specifically excludes allo-transplants for multiple myeloma. There is no other way to read Chapter 6 with its references to Chapter 4. The two chapters must be read together, and there is no confusion or ambiguity in the language of these two chapters. These chapters together comply with the mandate of HRS § 432E-1.4(a) in specifically excluding allo-transplant coverage for multiple myeloma.

B.
The Panel found that an allo-transplant "for multiple myeloma is not a covered benefit under the Plan." The Panel further found that "[a] reasonable person reviewing the Plan language could readily determine that an [allo-transplant] was not a covered benefit." Nevertheless, the Panel concluded that an allo-transplant for the treatment of multiple myeloma "is not specifically excluded under the Plan" because the exclusion "is not specifically enumerated as an excluded benefit in Plan Chapter 6: Services Not Covered." Therefore, the Panel concluded that Adams "is entitled to coverage for an [allo-transplant] if such treatment is medically necessary as provided in HRS § 432E-1.4. The requirements of HRS [C]hapter 432E override the Plan language and/or [HMSA's] interpretation that treatment is not medical[ly] necessary."
Whether a health intervention shall be covered for contractual purposes under HRS § 432E-1.4(a) is "a question of law to be reviewed de novo." `Olelo v. Office of Info. Practices, 116 Hawai'i 337, 346, 173 P.3d 484, 493 (2007); see also Wittig v. Allianz, A.G., 112 Hawai'i 195, 201, 145 P.3d 738, 744 (App.2006) (holding that when the language of a contract is unambiguous, the interpretation of the contract presents a question of law to be decided by the court). We are not required to give any deference to the Panel's legal determination that HRS § 432E-1.4(a) required HMSA to list the specifically excluded service in Chapter 6 rather than exclude the service by cross-references between Chapters 6 and 4. The ad hoc Panel was composed of "a representative from a managed care plan not involved in the complaint, a provider licensed to practice and practicing medicine in Hawaii not involved in the complaint, and the [C]ommissioner or the [C]ommissioner's designee." HRS § 432E-6(a). We conclude that the legislature did not grant such HRS § 432E-6 ad hoc review panels discretion to interpret HRS § 432E-1.4(a). See `Olelo, 116 Hawai'i at 346, 173 P.3d at 493. Otherwise, coverage determinations regarding a plan for the same treatment and medical condition would vary from panel to panel.

*1271 C.
HRS § 432E-1.4(a) expressly provides in relevant part that "[f]or contractual purposes, a health intervention shall be covered if it is an otherwise covered category of service, not specifically excluded." Although the Panel determined that an allo-transplant for multiple myeloma was not a covered benefit under the Plan, the Panel nevertheless held that HMSA was required to provide coverage for an allo-transplant for multiple myeloma because the Plan did not specifically list multiple myeloma in Chapter 6 as a medical condition for which an allo-transplant was excluded from coverage. Under the Panel's interpretation of the Plan, HMSA would be required to list every conceivable medical condition for which coverage for allo-transplants would be excluded. This is not practical or reasonable. It is clear from a reading of Chapters 4 and 6 of the Plan, as the Plan expressly found, that coverage is specifically excluded for allo-transplants for multiple myeloma.

IV.
Because we conclude that an allo-transplant for the treatment of multiple myeloma was specifically excluded by the Plan pursuant to HRS § 432E-1.4(a), HMSA's other points on appeal are moot and we do not address them.
For the foregoing reasons, the Judgment filed on November 13, 2007 in the Circuit Court of the First Circuit is vacated, and this case is remanded to the circuit court with instructions to reverse the "Findings of Fact, Conclusions of Law, Discussion and Order" and enter judgment on behalf of HMSA.
NOTES
[1] The Honorable Eden Elizabeth Hifo presided.
[2] An allogeneic transplant involves the harvesting and transplanting of stem cells from a matched donor.
[3] Brent Adams was the Petitioner-Appellee-Appellee in this case. On April 7, 2009, Patricia E.G. Adams, in her capacity as Personal Representative of the Estate of Brent Adams, filed a motion asking this court to allow her to substitute as the Petitioner-Appellee-Appellee in place of Adams, who was deceased. This court granted the motion on April 13, 2009.
[4] A "myeloma" is a form of cancer which affects the bone marrow cells (as myelocytes or plasma cells) and usually involves several different bones at the same time. "Multiple myeloma" refers to the presence of numerous myelomas in various bones of the body.
[5] Chapter 6 of the Plan expressly excluded from coverage experimental or investigative treatment, as follows:

Experimental or Investigative Treatment You are not covered for medical treatments, procedures, drugs, devices, or care, and all related services or supplies (except for routine care described as covered in Chapter 4 of this Guide), that are experimental or investigational. A medical treatment, procedure, drug, device, or care is experimental or investigative if:
&lhblk; The drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug Administration (FDA) and FDA approval for marketing for the proposed use has not been given at the time the drug or device is furnished, unless the off-label use is listed as an approved/accepted indication in the USPDI (United States Pharmacopeial Drug Information), AHFS (American Hospital Formulary Service Drug Information), or the member demonstrates that the weight of the scientific evidence establishes the medical necessity of the drug for treatment of the member's condition; or
&lhblk; The drug, device, medical treatment, or procedure, or the patient informed consent document utilized with the drug, device, treatment, or procedure, was reviewed and approved by the treating facility's Institutional Review Board or other body serving a similar function, or if federal law requires such review and approval; or
&lhblk; Reliable evidence shows that the drug, device, medical treatment or procedure is the subject of ongoing phase I or phase II clinical trials, is for the research, experimental, study or investigational arm of ongoing phase III clinical trials, or is otherwise under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis; or
&lhblk; Reliable evidence shows that the prevailing opinion among experts regarding the drug, device, medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, toxicity, safety, efficacy or its efficacy compared with a standard means of treatment or diagnosis.
Reliable Evidence shall mean only:
&lhblk; published reports and articles in authoritative medical and scientific literature;
&lhblk; the written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, device, medical treatment, or procedure; or
&lhblk; the written informed consent used by the treating facility or by another facility studying substantially the same drug, device, medical treatment or procedure.
At oral argument, HMSA's counsel stated that HMSA's denial of coverage for an allo-transplant for Adams on the basis that such treatment was "investigational" is not an issue in this appeal.
[6] A Medical Advisory Panel comprised of independent, nationally recognized experts in technology assessment, clinical research, and medical specialties has scientific accountability for all TEC assessments. The eighteen-member panel, which includes appointees from the American College of Physicians, American Academy of Family Physicians, American Academy of Pediatrics, and American College of Surgeons, meets three times a year to review TEC assessments and judge the quality of evidence and the relative weight of the potential benefits and harms. In 1997, TEC was designated as one of twelve original evidence-based practice centers for the federal Agency for Healthcare Research and Quality.
[7] In contrast, multiple myeloma is listed as covered, with approval, for auto-transplants if "newly diagnosed or responsive to previous treatment for multiple myeloma."