126 P.3d 1098

**The SIERRA CLUB, a California non-profit corporation registered to do business in the State of Hawai'i, Appellant/Plaintiff–Appellee,**

v.

**OFFICE OF PLANNING, STATE OF HAWAI'I, Appellee/Defendant–Appellant,**

and

**The Land Use Commission of the State of Hawai'i; Lawrence N.C. Ing, in his capacity as Vice–Chairperson of the Land Use Commission of the State of Hawai'i; Castle & Cooke Homes Hawaii, Inc., a Hawai'i corporation; Pacific Health Community, Inc., a Hawai'i corporation; City and County of Honolulu; and Neighborhood Board No. 25, Appellees/Defendants–Appellees.**

No. 26174.

Supreme Court of Hawai'i.

Jan. 27, 2006.

Deborah Day Emerson and John W.K. Chang, Deputy Attorneys General, On the briefs, for appellee/defendant-appellant Office of Planning, State of Hawai'i.

Russell A. Suzuki and Diane Erickson, Deputy Attorneys General, On the briefs, for appellees/defendants-appellees The Land Use Commission of the State of Hawai'i and Lawrence N.C. Ing, in his capacity as Vice–Chairperson of the Land Use Commission of the State of Hawai'i.

Isaac Hall, On the briefs, Wailuku, for appellant/plaintiff-appellee The Sierra Club.

William W.L. Yuen, On the briefs, Honolulu, for appellee/defendant-appellee Pacific Health Community, Inc.

Bruce L. Lamon (of Goodsill Anderson Quinn & Stifel), On the briefs, Honolulu, for appellee/defendant-appellee Castle & Cooke Homes Hawaii, Inc.

Lori K.K. Sunakoda, Deputy Corporation Counsel, for appellee/defendant-appellee City and County of Honolulu (no brief filed).

Neighborhood Board No. 25 c/o Richard G. Poirier, for appellee/defendant-appellee Neighborhood Board No. 25 (no brief filed).

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Appellee/Defendant–Appellant State Office of Planning, State of Hawai'i (SOP), appeals from the Circuit Court of the First Circuit's September 23, 2003 final judgment entered in favor of Appellant/Plaintiff–Appellee The Sierra Club (Sierra Club).[1] SOP and Appellees/Defendants–Appellees The Land Use Commission of the State of Hawai'i (the LUC), Castle & Cooke Homes Hawaii, Inc. (Castle & Cooke), and Pacific Health Community, Inc. (Pacific Health) [hereinafter, collectively, Defendants] contend that the circuit court erred by vacating the decision of the LUC.

Based on the following, we affirm the circuit court's September 23, 2003 final judgment.

## I. BACKGROUND

On November 14, 2000, Castle & Cooke and Pacific Health applied to the LUC to amend a land use boundary for 1,247.983 acres of land in an agricultural district, owned by Castle & Cooke. The petition asked the LUC to reclassify the land as an urban district, so that Castle & Cooke could develop the Koa Ridge Project [hereinafter, the Project], consisting of thousands of homes, a commercial center, elementary school, park, church/day care, recreation center, and the Pacific Health Center. According to the Project's "Infrastructural Report," Castle & Cooke would eventually construct a thirty-six-inch sewage transmission line for the purpose of transporting wastewater from the Project to the Waipahu Wastewater Treatment Plant, as well as a new water transmission line to provide water to the Project. The construction of these lines would require Castle & Cooke to tunnel underneath Kamehameha Highway, the H–1 Freeway, the H–2 Freeway, and Farrington Highway, all of which are state land.

On July 9, 2001, SOP filed a "Statement Of Position Of The Office Of Planning In Partial Support Of The Petition." On July 18, 2001, and by a written order dated August 13, 2001, the LUC granted Sierra Club's and Appellees/Defendants–Appellees Neighborhood Board No. 25's petitions to intervene. On August 3, 2001, Appellees/Defendants–Appellees City and County of Honolulu filed a "Statement Of Position Of The Department Of Planning And Permitting, City And County Of Honolulu."

On August 7, 2001, Sierra Club filed a motion with the LUC to stay proceedings in Castle & Cooke and Pacific Health's petition until they complied with Hawai'i Revised Statutes (HRS) Chapter 343, otherwise known as the Hawai'i Environmental Policy Act (HEPA) [hereinafter, Chapter 343 or HEPA]. Sierra Club asserted that the plan to construct the transmission lines underneath these highways and freeways involved the "use of state lands," thereby triggering the requirement for an environmental assessment [hereinafter, EA] pursuant to HRS § 343–5 (1993 & Supp.2000). Sierra Club argued that absent an EA, Castle & Cooke and Pacific Health were not entitled to have the LUC grant their application to reclassify the land. Castle & Cooke and Pacific Health filed a Memorandum in Opposition to Sierra Club's motion on August 14, 2001, admitting that an EA was required but arguing that it would be prepared later. The LUC entered a written order denying Sierra Club's motion on September 26, 2001.

On June 27, 2002, the LUC filed its "Findings of Fact and Conclusions of Law, and Decision and Order." As part of its decision, the LUC reclassified 762.453 acres from an agricultural district to an urban district without requiring Castle & Cooke and Pacific Health to prepare an EA.

On July 23, 2002, Sierra Club filed a notice of appeal to the First Circuit Court. After an oral argument hearing on January

---

1. The Honorable Eden Elizabeth Hifo presided    over this matter.

21, 2003, the circuit court entered its "Order Vacating Decision and Order of the State Land Use Commission Filed June 27, 2002 In Docket No. A00–734 and Remanding Petition For Land Use District Boundary Amendment For Further Proceedings" on September 23, 2003. The circuit court ruled that the Project is an "applicant action" that proposes the use of state land within the ambit of HRS § 343–5(c) (1993), and Castle & Cooke and Pacific Health must therefore complete an EA before the LUC can grant their application to amend the land use boundary. Final judgment was entered on September 23, 2003. On October 23, 2003, SOP filed this timely appeal.[2]

## II. STANDARD OF REVIEW

▆ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (alteration in original) (quoting Bragg v. State Farm Mut. Auto. Ins., 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)). HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." In re Hawaiian Elec. Co., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing Outdoor Circle v. Harold K.L. Castle Trust Estate, 4 Haw.App. 633, 638–39, 675 P.2d 784, 789 (1983)). Thus, statutory interpretation is "a question of law reviewable de novo." State v. Levi, 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting State v. Arceo, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). With respect to statutory interpretation, we have stated:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

State Farm Mut. Auto. Ins. Co. v. Gepaya, 103 Hawai'i 142, 145, 80 P.3d 321, 324 (2003) (quoting Troyer v. Adams, 102 Hawai'i 399, 409, 77 P.3d 83, 93 (2003)).

## III. DISCUSSION

### A. Overview of the Environmental Review Process

HRS § 343–1 (1993) states the purpose of HEPA:

---

**2.** Sierra Club argues that SOP lacks standing to appeal because "[t]he only agency which is 'aggrieved' and thereby has standing to appeal in a situation like this one is the agency entrusted with the implementation of the particular legislation at issue." Pursuant to HRS § 91–14(a) (1993), however, "the term 'person aggrieved'

shall include an agency that is a party to a contested case proceeding before that agency or another agency." Because SOP was a party to the contested case proceeding before the LUC, SOP is a "person aggrieved" and has standing to appeal.

The legislature finds that the quality of humanity's environment is critical to humanity's well being, that humanity's activities have broad and profound effects upon the interrelations of all components of the environment, and that an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions. The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole.

It is the purpose of this chapter to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations.

We described HEPA's environmental review process in *Price v. Obayashi Hawaii Corp.*:

Once a proposed action is subject to the environmental review process, an environmental assessment is made by the applicant and is used to evaluate the possible environmental effects of a proposed action. The agency reviewing the assessment then determines if there are "significant" environmental impacts anticipated. If there is a determination that there may be "significant" environmental impacts, the accepting agency then files an [environmental impact statement] [ (]EIS[) ] preparation notice with the [Office of Environmental Quality Control] [ (]OEQC[) ], which in turn publishes the notice in the OEQC bulletin. Publication of this notice initiates a 30 day consultation period during which the public and interested agencies or organizations may submit written comments regarding adverse effects of the proposed action. The proposing agency or applicant must respond in writing and address all concerns and questions before proceeding with the development of the EIS. Once this phase of the process is complete, the applicant then begins preparation of the EIS.

81 Hawai'i 171, 180, 914 P.2d 1364, 1373 (1996) (internal citations, quotation marks, and footnote omitted).

B. *The Project Constitutes an "Action" that Triggers the Requirement For an EA, as it is a "Project to be Initiated" By an Applicant.*

■ Defendants first assert that the circuit court erred in determining that the petition for reclassification triggered HRS § 343–5's EA requirement because such a petition does not constitute an "action" within the meaning of Chapter 343. We disagree.

HRS § 343–5(a) (1993) provides, in relevant part:

(a) Except as otherwise provided, an environmental assessment shall be required for *actions* which:

(1) *Propose the use of state or county lands* or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects which the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies[.]

(Emphases added.). HRS § 343–2 (1993 & Supp.2000), in turn, defines "action" as "any program or project to be initiated by any agency or applicant." Thus, according to the plain and unambiguous language of the statute, the Project is an "action" because it is a "project to be initiated" by applicants Castle & Cooke and Pacific Health.

Additionally, the Project proposes the use of state lands inasmuch as the construction of the sewage and water transmission lines will require tunneling beneath state highways. *See Citizens for Prot. of N. Kohala Coastline v. County of Hawai'i* [hereinafter, *Citizens* ], 91 Hawai'i 94, 103, 979 P.2d 1120, 1129 (1999) ("[C]onstruction of two underpasses under a state highway constitutes use of state lands for purposes of HRS 343–5(a)(1) (1993).");

*Kahana Sunset Owners Ass'n v. County of Maui* [hereinafter, *Kahana Sunset*], 86 Hawai'i 66, 74, 947 P.2d 378, 386 (1997) (holding that the proposed drainage system, which would run under state land, was "part of the larger project," and, thus, the EA "must address the environmental effects of the entire proposed development"). Accordingly, the Project is an action that proposes the use of state lands, and an EA that addresses the environmental effects of the entire Project is required.

Defendants agree that an EA will eventually be required; they contend, however, that an EA is not required at the reclassification stage. Sierra Club disagrees, and cites HRS § 343–5(c) in support:

> Whenever an applicant proposes an action specified by subsection (a) which requires approval of an agency, and which is not a specific type of action declared exempt under section 343–6, the *agency receiving the request for approval shall prepare an environmental assessment of such proposed action at the earliest practicable time* to determine whether an environmental impact statement shall be required.

(Emphasis added.).

In response, Defendants assert that an EA is not required at the reclassification stage because it is not the "earliest practicable time" for the EA to be prepared. The meaning of "earliest practicable time" within the context of HRS § 343–5(c) is thus determinative, as will now be discussed.

C. *The LUC's Consideration of the Reclassification Petition was the "Earliest Practicable Time" at Which to Prepare the EA.*

**1. The Requirement For an EA at the Reclassification Stage Would Not be Premature.**

Defendants assert that the preparation of an EA is premature at the reclassification stage because HRS § 343–5 will require Castle & Cooke and Pacific Health to prepare

and submit an EA at a later time. For the following reasons, this argument is without merit.

> a. *Although reclassification petitions do not trigger the EA requirement as a per se matter, an EA can be required at the reclassification stage.*

Defendants assert that the legislative history of Chapter 343 and the cannon of statutory construction, *"expressio unius est exclusio alterius"* [the expression of one thing is the exclusion of others], counsel against an interpretation that an EA can be required at the reclassification stage. Specifically, Defendants argue that: (1) the legislature's rejection of a proposal to make Chapter 343 applicable to all district boundary amendments evinces its intent that Chapter 343 is never applicable to district boundary amendments and (2) because HRS § 343–5(a)(7) (1993) [3] specifies that an EA is required for actions which propose reclassification of land classified as conservation, the *"expressio unius est exclusio alterius"* canon dictates that an EA is not required for actions which propose reclassification of land classified as agricultural. These assertions are unavailing.

We agree that a reclassification petition for non-conservation lands, *in and of itself,* does not trigger the EA requirement. It does not follow, however, that the EA requirement can never be triggered at the reclassification stage. Had the legislature intended to exempt all reclassification petitions from the EA requirement, it could have easily so indicated. Therefore, an EA can be required at the reclassification stage if one of the triggers set forth in HRS § 343–5(a) applies to the proposed project. In the instant case, reclassification is the initial step of a project that *proposes the use of state lands;* it is the proposed use of state land that triggers the EA requirement, and the request for approval of the reclassification petition that pro-

---

**3.** HRS § 343–5(a) provides in relevant part:

> Except as otherwise provided, an environmental assessment shall be required for actions which:

. . . .

> (7) Propose any reclassification of any land classified as conservation district by the state land use commission under chapter 205[.]

vides the earliest practicable time at which to prepare the EA.

    b. *The requirement of an EA was triggered at the reclassification stage because Castle & Cooke and Pacific Health proposed the Project, which requires the LUC to approve the reclassification.*

Defendants next assert that the EA requirement cannot be triggered at the reclassification stage because the LUC is not an agency that can "receiv[e] the request for approval" pursuant to HRS § 343–5(c). This argument is without merit.

Pursuant to HRS § 343–5(c), as set forth *supra*, if the following three elements are present, "the agency receiving the request for approval shall prepare an environmental assessment of [the] proposed action at the earliest practicable time": (1) an applicant proposes an action specified by HRS § 343–5(a); (2) the action requires approval of an agency; and (3) the action is not exempt under HRS § 343–6 (1993).[4]

With respect to the first element, as discussed in Section III.B., *supra*, the Project constitutes an action specified by HRS § 343–5(a). Defendants assert, however, that Castle & Cooke and Pacific Health have not "proposed" the Project to the LUC inasmuch as the LUC merely reclassifies land and it has no authority to approve projects. Defendants' assertion diminishes the important role played by the LUC. As was done in the instant case, the LUC must consider the entire project in determining whether to reclassify land. Pursuant to HAR § 15–15–50 (2000),[5] the reclassification petition must include, *inter alia:*

    (6) Type of use or development being proposed, including without limitation,

a description of any planned development, residential, golf course, open space, resort, commercial, or industrial use;

    (7) A statement of projected number of lots, lot size, number of units, densities, selling price, intended market, and development timetables;

. . . .

    (10) *An assessment of the impacts of the proposed use or development upon the environment,* agriculture, recreational, cultural, historic, scenic, flora and fauna, groundwater, or other resources of the area[.]

(Emphasis added.). Indeed, in its Decision and Order in the instant case, the LUC conducted a detailed review of the entire project before granting the district boundary amendment, and placed conditions thereon based on this review. For example, the "Proposal for Reclassification" section of the Decision and Order describes the Project in great detail. There is another section on the "Need for the Proposed Development" as well as the "Socio–Economic Impacts" of the Project, the "Impact on Resources of the Area," and the noise and air quality impacts of the Project. Additionally, the LUC conditioned the reclassification on Castle & Cooke and Pacific Health's compliance with twenty-six conditions, one of which stated that Castle & Cooke and Pacific Health "shall develop the reclassified area in substantial compliance with the representations made to the Commission. . . . Failure to so develop the reclassified area may result in reversion of the reclassified area to its former classification, or change to a more appropriate classification." Therefore, Castle & Cooke and Pacific Health have "proposed" the Project to

---

4.  HRS § 343–6 provides, in relevant part:
    (a) After consultation with the affected agencies, the council shall adopt, amend, or repeal necessary rules for the purposes of this chapter in accordance with chapter 91 including, but not limited to, rules which shall:
    . . . .
    (7) Establish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an assessment[.]

Pursuant to HRS § 343–6(a)(7), Hawai'i Administrative Rules (HAR) § 11–200–8 (1996) was adopted, which lists exempt classes of action. No party has asserted that the action in the instant case is exempt.

5.  HAR Chapter 15 was adopted pursuant to HRS § 205–7 (1993), which authorizes the LUC to "adopt, amend or repeal rules relating to matters within its jurisdiction in the manner prescribed in chapter 91."

the LUC and, but for the LUC's comprehensive review of the Project as a whole, it would not have approved the reclassification petition. Thus, the first element is present.

The second element is also present because the Project requires the LUC's approval of the reclassification petition before the Project can proceed. HRS § 343–2 defines "approval" as "a discretionary consent required from an agency prior to actual implementation of an action." In turn, "discretionary consent" is defined as "a consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from a ministerial consent." The State Land Use Law refers to the granting of a petition for a district boundary amendment as an "approval" by the LUC. *See* HRS § 205–4(g) (Supp.2000) (stating that the LUC "shall act to *approve* the petition, deny the petition, or to modify the petition") (emphasis added). Therefore, the LUC is an agency from which Castle & Cooke and Pacific Health require a discretionary approval to amend the land use district before the Project can go forward.

Third, no party has asserted that the action is exempt under HRS § 343–6.

Accordingly, all three elements being present, the LUC, as the agency that has received the request for approval of the boundary amendment petition, is required by statute to prepare an EA of the proposed action at the earliest practicable time.

c. *The fact that the Project may change does not eliminate the statutory requirement of an EA at the earliest practicable time.*

Defendants assert that since only one EIS will be required for the Project pursuant to HRS § 343–5(g) (1993),[6] if we require the EA to be prepared at the reclassification stage, the resultant EIS may not contain adequate information for decision-makers and for public comment in later stages. Defendants state that the description of the Project presented to the LUC is "prelimi-

nary" and "conceptual", reasoning that "the project that is ultimately built, as a result of the actions of other agencies, may be very different from the one described to the LUC as justification for adjustment of land use classification." SOP and the LUC additionally assert that "an EA covering the whole petition area ... may cover more land that [sic] will be permitted for the project, or if reclassification is for part of the land or has conditions, the scope and nature of the project may change." Defendants therefore conclude that an EA prepared at the reclassification stage would not provide decision-makers with meaningful information.

These arguments are without merit. While projects indeed may change in response to public input, actions of agencies, economic conditions, or other factors, requiring early environmental assessment comports with the purpose of HEPA to "ensure that environmental concerns are given appropriate consideration in decision making," HRS § 343–1, and provides a safeguard against a *"post hoc* rationalization[ ] to support action already taken." *Citizens,* 91 Hawai'i at 105, 979 P.2d at 1131 (brackets in original) (quoting *Citizens for Responsible Gov't v. City of Albany,* 56 Cal.App.4th 1199, 1221, 66 Cal.Rptr.2d 102, 114 (1997)).

d. *Early environmental assessment comports with the purpose of HEPA.*

■ In *Citizens,* we stated the importance of early environmental assessment:

Requiring early environmental assessment of the Mahukona project comports with HRS § 343–5(c)'s express mandate that environmental review be undertaken at the "earliest practicable time." This result also finds support in the spirit and intent of HEPA to "establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations ... [and] alert decision makers to

6. HRS § 343–5(g) provides that "[a] statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for the proposed action shall be required."

significant environmental effects which may result from the implementation of certain actions." HRS § 343–1 (1993).

Consonant with these policies, both federal and state courts have recognized that environmental review must occur early enough to function practically as an input into the decision making process. In construing the National Environmental Policy Act (NEPA), for example, the United States Court of Appeals for the Ninth Circuit cautioned that *"[a]n assessment must be "prepared early enough so that it can serve practically as an important contribution to the decision making process and will not be used to rationalize or justify decisions already made." Save the Yaak Committee v. J.R. Block,* 840 F.2d 714, 718 (9th Cir.1987[1988]) (quoting 40 C.F.R. § 1502.5 (1987)). It further stated that federal agencies are required to " 'integrate the NEPA process with other planning at the *earliest possible time* to insure that planning and decisions reflect environmental values....' " *Id.* (emphasis added) (citing *Andrus v. Sierra Club,* 442 U.S. 347, 351, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979) (citations omitted), and *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982)). According to the *J.R. Block* Court, "[t]he rationale behind this rule is that *inflexibility may occur if delay in preparing an EIS is allowed: 'After major investment of both time and money, it is likely that more environmental harm will be tolerated.'* " *Id.* (quoting *Confederated Tribes and Bands of the Yakima Indian Nation v. FERC,* 746 F.2d 466, 471–72 (9th Cir. 1984) (citation omitted)). *See also Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C.Cir.1983) ("the EIS is a decision-making tool intended to 'insure that ... environmental amenities and values may be given appropriate consideration in decisionmaking....' Therefore, *the appropriate time for preparing an EIS is prior to a decision, when the decisionmaker retains a maximum range of options."*) (ellipsis points and emphasis in original) (citation omitted); Rodgers, *Environmental Law* § 9.7, at 921 (2d. ed. 1994) (NEPA's purpose is to *require consideration of environmental factors "before project momentum becomes irresistible, before options are closed, and before agency commitments are set in concrete."*).

Accordingly, *decisions reflecting environmental considerations can most easily be made when other basic decisions are also being made, that is, during the early stages of project conceptualization and planning.* Here, because the development and general dimensions of the project have been known to Chalon from the start, there should be no difficulty in providing "meaningful information" for HRS chapter 343 environmental review. Moreover, at this early stage, environmental review under HRS § 343–5 would be an integral part of the decision-making process. Indeed, *to require the DOT or DLNR, rather than the County of Hawai'i, to conduct an EA at some point in the future "might call for a burdensome reconsideration of decisions already made and would risk becoming a 'post hoc rationalization[ ] to support action already taken.' " Citizens for Responsible Government v. City of Albany,* 56 Cal.App.4th 1199, 1221, 66 Cal. Rptr.2d 102, 114 (1997) (brackets in original).

*Id.* at 104–05, 979 P.2d at 1130–31 (alterations in original) (some emphases added and some in original) (footnote omitted). We agree with the reasoning of *Citizens* that early environmental assessment comports with the purpose of HEPA to alert decisionmakers early in the development process because, "[a]fter major investment of both time and money, it is likely that more environmental harm will be tolerated." *Id.* at 105, 979 P.2d at 1131 (quoting *J.R. Block,* 840 F.2d at 718).[7]

---

**7.** Castle & Cooke asserts that *Citizens* supports the proposition that an EA is not required for a boundary amendment because in that case, we affirmed the district boundary amendment by the Hawai'i County Council without requiring an EA, notwithstanding that the reclassification was for a project that involved the use of state lands.

Castle & Cooke misconstrues the holding in that case. In *Citizens,* the issue was whether the Hawai'i County Council was responsible for processing the boundary amendment petition. We held that because the boundary amendment petition involved less than fifteen acres of land, the Hawai'i County Council, as opposed to the LUC,

Therefore, Defendants' contention that the preparation of an EA is premature at the reclassification stage is without merit.

### 2. The Requirement of an EA at the Reclassification Stage Would Not be Duplicative.

Defendants next assert that requiring an EA at the reclassification stage would be duplicative because HRS Chapter 205 ("Land Use Commission") requires the LUC to apply a more rigorous procedure in considering environmental impacts on land use reclassifications than would be required by an EA. To this end, Defendants cite to the concurring opinion in *Pearl Ridge Estates Comty. Ass'n v. Lear Siegler, Inc.,* 65 Haw. 133, 648 P.2d 702 (1982) (Nakamura, J., concurring). This argument is unavailing.

The concurring opinion in *Pearl Ridge* was based on the fact that the law in effect at that time stated that boundary amendments were subject to approval "only as reasonably necessary to accommodate growth and development, provided there are *no significant adverse effects* upon agricultural, natural, environmental, recreational, scenic, historic, or other resources of the area." *Pearl Ridge,* 65 Haw. at 139, 648 P.2d at 706 (Nakamura, J., concurring) (emphasis added) (quoting HRS § 205–16.1 (1976)). On the other hand, "HRS § 343–4 simply ensures agency consideration of environmental concerns before a decision is rendered." *Pearl Ridge,* 65 Haw. at 142, 648 P.2d at 708 (Nakamura, J., concurring). The concurring opinion concluded that because "[a]n obligation to engage in an environmental assessment pales in comparison with the[ ] stringent preconditions for the approval of a boundary amendment[,]" *id.* at 142–43, 648 P.2d at 708 (Nakamura, J., concurring), engaging in an EA pursuant to Chapter 343 "would have served no constructive purpose in light of the actual constraints imposed on the Commission by HRS § 205–16.1." *Id.* at 142, 648 P.2d at 707 (Nakamura, J., concurring). However, HRS § 205–16.1 was repealed in 1985, 1985 Haw. Sess. L. Act 230, § 6 at 420, and eventually replaced with

HRS § 205–17 (1993), applicable in the instant case, which provides in relevant part:

> In its review of any petition for reclassification of district boundaries pursuant to this chapter, the commission shall specifically *consider* the following:
>
> . . . .
>
> (3) The impact of the proposed reclassification on the following areas of state concern:
>
> (A) Preservation or maintenance of important natural systems or habitats;
>
> (B) Maintenance of valued cultural, historical, or natural resources;
>
> (C) Maintenance of other natural resources relevant to Hawaii's economy, including, but not limited to, agricultural resources[.]

(Emphasis added.). The new statutory language does not impose more stringent requirements for reclassification of district boundaries than the requirements of an EA, and thus the rationale of the *Pearl Ridge* concurrence is not applicable to the instant case. In addition, reading HRS Chapters 205 and 343 *in pari materia,* the preparation of an EA pursuant to Chapter 343 would assist the LUC in considering the environmental impacts as required by Chapter 205.

Defendants finally contend that, if an EA was required at the reclassification stage, the LUC did in fact consider factors required to be addressed by an EA under Chapter 343, and "in the underlying proceedings before the LUC, other agencies, the parties and the public had a full opportunity to consider all the factors considered in an EA/EIS[.]" On the record before us, we cannot accept this "functional equivalent of a required EA" argument. The LUC did *not* make a finding that the information presented at the contested case hearing was the equivalent of an EA, and we have previously stated that "[i]t would be overly speculative for this court to make a determination as to whether the information adduced at the contested case hearing was the functional equivalent of the

was the proper agency to process the petition. 91 Hawai'i at 107, 979 P.2d at 1133. We did *not* decide whether an EA was or was not required to

assist the decision-making of the Hawai'i County Council.

required environmental assessment." *Kahana Sunset,* 86 Hawai'i at 74, 947 P.2d at 386.

### IV. *CONCLUSION*

Based on the foregoing, we hold that the circuit court did not err in concluding that the "earliest practicable time" to prepare an EA in the instant case was at the boundary amendment stage. We therefore affirm the circuit court's September 23, 2003 final judgment vacating the LUC's June 27, 2002 Decision and Order.