**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0002125
31-AUG-2016
11:12 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

RENE UMBERGER, MIKE NAKACHI, KA'IMI KAUPIKO,
WILLIE KAUPIKO, CONSERVATION COUNCIL FOR HAWAI'I,
HUMANE SOCIETY OF THE UNITED STATES, and
CENTER FOR BIOLOGICAL DIVERSITY, Plaintiffs-Appellants,
v. DEPARTMENT OF LAND AND NATURAL RESOURCES,
STATE OF HAWAI'I, Defendant-Appellee

NO. CAAP-13-0002125

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 12-1-2625-10 JHC)

AUGUST 31, 2016

FUJISE, PRESIDING JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY LEONARD, J.

Plaintiffs-Appellants Rene Umberger, Mike Nakachi,

Ka'imi Kaupiko, Willie Kaupiko, Conservation Council for Hawai'i

(CCH), Humane Society of the United States (Humane Society), and

Center for Biological Diversity (CBD) (collectively, Plaintiffs

or Appellants), appeal from the Circuit Court of the First

Circuit's (Circuit Court) June 24, 2013 Order Granting Department

of Land and Natural Resources State of Hawaii's [(DLNR's)], Motion for Summary Judgment filed February 4, 2013, and Denying Plaintiffs' Motion for Summary Judgment filed February 5, 2013 (**Summary Judgment Order**), and the Final Judgment in Favor of Defendant and Against Plaintiffs (**Judgment**), also filed on June 24, 2013.[1]

The dispute concerns whether DLNR must require each applicant for an aquarium fish permit to comply with the environmental review procedures set forth in Hawaii Revised Statutes (**HRS**) chapter 343, the Hawai'i Environmental Policy Act (**HEPA**),[2] before DLNR issues a permit pursuant to HRS § 188-31(a) (2011).

Appellants ask the court to vacate the Circuit Court's Summary Judgment Order and Judgment and require the Circuit Court to: (1) issue a declaratory judgment concluding that (a) DLNR is in violation of HEPA for failing to comply with the statute prior to approving the aquarium collection permits, and (b) DLNR's issuance and/or renewal of such permits without complying with HEPA is invalid and illegal; and (2) issue an injunction enjoining collection under existing aquarium fish permits and enjoining DLNR from approving any additional permits until it fully complies with HEPA. For the following reasons, we affirm the Summary Judgment Order and Judgment.

---

[1] The Honorable Jeannette H. Castagnetti presided.

[2] Although "HRS chapter 343 is entitled 'Environmental Impact Statements,' the law has long been referred to, by the public and [appellate] court[s], as the Hawai'i Environmental Policy Act." Sierra Club v. Dep't of Transp., 115 Hawai'i 299, 304 n.4, 167 P.3d 292, 297 n.4 (2007).

I.   BACKGROUND FACTS

Appellants consist of concerned individuals and three nonprofit organizations.  CCH is a citizens' organization with approximately 5,500 members and its mission is to "protect native Hawaiian species and to restore native Hawaiian ecosystems for future generations."  The Humane Society is a national organization "dedicated to the protection of wildlife and habitat."  The Humane Society has over 11 million members, including 55,000 of which live in Hawaiʻi.  CBD is an organization "dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands."  CBD has approximately 450,000 members, many of whom reside in Hawaiʻi.

DLNR is the state agency responsible for managing, administering, and exercising control over the State's water resources and ocean waters.  HRS § 171-3 (2011).  The Division of Aquatic Resources is the division within DLNR responsible for evaluating and administering aquarium collection permits.  DLNR has the authority to issue and renew aquarium fish permits pursuant to HRS § 188-31, which provides:

> **§ 188-31  Permits to take aquatic life for aquarium purposes.**  (a) Except as prohibited by law, the department, upon receipt of a written application, may issue an aquarium fish permit, not longer than one year in duration, to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes.
>
> (b)   Except as prohibited by law, the permits shall be issued only to persons who can satisfy the department that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health.
>
> (c)   It shall be illegal to sell or offer for sale any fish and other aquatic life taken under an aquarium fish

permit unless those fish and other aquatic life are sold alive for aquarium purposes.

The department may adopt rules pursuant to chapter 91 for the purpose of this section.

(d)    For the purposes of this section:

(1)    "Aquarium purposes" means to hold salt water fish, freshwater nongame fish, or other aquatic life alive in a state of captivity as pets, for scientific study, or for public exhibition or display, or for sale for these purposes; and

(2)    "Aquarium fish permit" means a permit issued by the board for the use of fine mesh nets and traps to take salt water fish, freshwater nongame fish, or other aquatic life for aquarium purposes.

On October 24, 2012, Appellants filed a complaint for declaratory and injunctive relief, seeking, *inter alia*, a declaration that DLNR is in violation of HEPA because it has failed to require aquarium fish permit applicants to, at a minimum, prepare environmental assessments (**EAs**) and engage in the related process of consultation, information gathering, and public review and comment.  Appellants also asserted that DLNR's "issuance and renewal of the challenged permits required discretionary agency approval to allow the applicants to use State lands-the State's waters-to collect fish and invertebrates for the aquarium trade."

On February 4, 2013, DLNR filed a motion for summary judgment, contending that there are no disputed issues of fact and that the issue of whether an EA is required is a matter of law.  DLNR argued that an EA is not required for two reasons: (1) the collection of aquarium fish under DLNR-issued permits does not constitute applicant action; and (2) there is no agency approval.  DLNR argued that aquarium collection under DLNR-issued permits does not constitute an applicant action because it is not

a specific, identifiable project. Additionally, DLNR contended that the permit application process is online and completely automatic and that "there is no space in the process for the State or its officials to exercise discretion."

On February 5, 2013, Appellants filed a motion for summary judgment, contending that they are entitled to judgment as a matter of law because "HEPA requires DLNR to, at a minimum, require preparation of EAs before allowing aquarium collection under the [p]ermits and before approving any additional permits." Appellants argued that aquarium collection under the DLNR-issued permits constitutes the use of state land which triggers environmental review under HEPA and that DLNR's issuance of the permits is a discretionary action that constitutes "approval" under HEPA.

After further submissions from the parties, on May 21, 2013, the Circuit Court held a hearing on the motions for summary judgment. In a minute order entered on May 28, 2013 (**Minute Order**), the Circuit Court granted DLNR's motion for summary judgment and denied Appellants' motion for summary judgment. The Circuit Court noted that the parties "agree that there are no genuine issues of material fact and [that] this court may rule on the question presented as a matter of law."

In its Minute Order, the Circuit Court stated that the "applicant 'action' at issue here, according to plaintiffs, is 'aquarium collection' for each individual permit authorized by DLNR pursuant to HRS § 188-31" and that the "broad 'action' of 'aquarium collection' is neither a program nor a project as those

terms are generally defined." The Circuit Court recognized that the cases cited by the parties in their motions for summary judgment involve specifically identifiable programs or projects such as the Koa Ridge development project, the Hawai'i Superferry project and a research program concerning genetically modified algae. The Circuit Court concluded, as a matter of law, that "'aquarium collection' does not specifically identify any program or project to review for HEPA purposes." The Circuit Court also concluded, as a matter of law, "'aquarium collection' is not an applicant 'action' that triggers HEPA." The Summary Judgment Order, entered on June 24, 2013, states that the court denied Appellants' motion and granted DLNR's motion "on the ground that there is no applicant 'action' that triggers [HEPA]." Judgment was entered in favor of DLNR on June 24, 2013.

Appellants filed a timely notice of appeal on July 18, 2013.

II. POINT OF ERROR ON APPEAL

Appellants raise a single point of error, contending that the Circuit Court erred when it concluded that aquarium collection under an aquarium fish permit issued by DLNR is not an "applicant action" under HEPA.

III. APPLICABLE STANDARD OF REVIEW

An order on a motion for summary judgment is reviewed de novo. See, e.g., Gurrobat v. HTH Corp., 133 Hawai'i 1, 14, 323 P.3d 792, 805 (2014).

"Statutory interpretation is a question of law reviewable de novo." State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted).

IV. DISCUSSION

Appellants have raised serious concerns about the potential for significant, detrimental effects on Hawai'i's reef ecosystems resulting from "allowing reefs to be stripped of an unlimited number of fish and other marine animals, without analyzing the impacts on the environment and without any regulation or oversight." There is no question that the DLNR shares Appellants' concerns about the health of Hawai'i's reefs and its marine inhabitants and seeks to appropriately manage and administer the aquatic life and aquatic resources of the State in accordance with all applicable laws. The question before this court, however, is not whether DLNR should more stringently regulate these resources, whether too many aquarium fish are being taken from Hawai'i's waters, or whether more regulation or oversight should be implemented to protect the aquatic life that is collected for aquarium purposes, particularly by large-scale, commercial collectors. Rather, the question before us is whether a particular Hawai'i statute, HEPA, is intended to apply so that each applicant for an aquarium fish permit must, at a minimum, prepare an EA – as well as engage in the related process of consultation, information gathering, and public review and comment – and DLNR must, with each application, undertake a HEPA review prior to issuing an aquarium fish permit.

A.    HEPA

In enacting HEPA, the Hawai'i Legislature established a "system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HRS § 343-1 (2010). The framework of HEPA "consists of various stages of assessment by the proposing or accepting agency, each of which may entail additional review procedures." Sierra Club v. Dep't of Transp., 115 Hawai'i 299, 306, 167 P.3d 292, 299 (2007) (Sierra Club II). The Hawai'i Supreme Court has described the environmental review process as follows:

> Once a proposed action is subject to the environmental review process, an environmental assessment is made by the applicant and is used to evaluate the possible environmental effects of a proposed action. The agency reviewing the assessment then determines if there are "significant" environmental impacts anticipated. If there is a determination that there may be "significant" environmental impacts, the accepting agency then files an environmental impact statement (EIS) preparation notice with the Office of Environmental Quality Control (OEQC), which in turn publishes the notice in the OEQC bulletin. Publication of this notice initiates a 30 day consultation period during which the public and interested agencies or organizations may submit written comments regarding adverse effects of the proposed action. The proposing agency or applicant must respond in writing and address all concerns and questions before proceeding with the development of the EIS. Once this phase of the process is complete, the applicant then begins preparation of the EIS.

Sierra Club v. Office of Planning, 109 Hawai'i 411, 415, 126 P.3d 1098, 1102 (2006) (citing Price v. Obayashi Haw. Corp., 81 Hawai'i 171, 180, 914 P.2d 1364, 1373 (1996)) (Sierra Club I) (brackets omitted).

"An important preliminary step in assessing whether an 'action' is subject to environmental review is defining the action itself." Sierra Club II, 115 Hawai'i at 306 n.6, 167

8

P.3d at 299 n.6.  An "action" is "any program or project to be initiated by an agency or applicant."  HRS § 343-2 (2010).  An EA is required for "actions" that meet certain criteria.  Sierra Club II, 115 Hawai'i at 306, 167 P.3d at 299.  First, the action must be initiated by a government agency ("agency actions") or by a private party who requires government approval ("applicant actions").  HRS § 343-2; Sierra Club II, 115 Hawai'i at 306, 167 P.3d at 299.  Second, the "action" must fall within one or more of nine categories listed under HRS § 343-5 (2010).[3]  Third, the

---

[3]     HRS § 343-5 provides, in relevant part:

§ 343-5  Applicability and requirements.  (a) Except as otherwise provided, an environmental assessment shall be required for actions that:

(1)     Propose the use of state or county lands or the use of state or county funds . . .
(2)     Propose any use within any land classified as a conservation district by the state land use commission under chapter 205;
(3)     Propose any use within a shoreline area as defined in section 205A-41;
(4)     Propose any use within any historic site as designated in the National Register or Hawaii Register, as provided for in the Historic Preservation Act of 1966, Public Law 89-665, or chapter 6E;
(5)     Propose any use within the Waikiki area of Oahu, the boundaries of which are delineated in the land use ordinance as amended, establishing the "Waikiki Special District";
(6)     Propose any amendments to existing county general plans where the amendment would result in designations other than agriculture, conservation, or preservation, except actions proposing any new county general plan or amendments to any existing county general plan initiated by a county;
(7)     Propose any reclassification of any land classified as a conservation district by the state land use commission under chapter 205;
(8)     Propose the construction of new or the expansion or modification of existing helicopter facilities within the State. . .
(9)     Propose any:
(A) Wastewater treatment unit, except an individual wastewater system or a wastewater treatment unit serving fewer than fifty single-family dwellings or the equivalent;
(B) Waste-to-energy facility;
(C) Landfill;
(D) Oil refinery; or
(E) Power-generating facility.

"action" must not be exempt under HRS § 343-6(a)(2) (2010).[5] Id. If the alleged "action" fulfills these three criteria, then it is an action subject to the HEPA environmental review process.

In the instant case, Appellants challenge DLNR's issuance and renewal of aquarium fish permits pursuant to HRS § 188-31. DLNR is authorized to "issue an aquarium fish permit, not longer than one year in duration, to use fine meshed traps, or fine meshed nets other than throw nets, for the taking of marine or freshwater nongame fish and other aquatic life for aquarium purposes." HRS § 188-31(a). A person may apply for either a "recreational aquarium fish permit" or a "commercial aquarium fish permit.[6] HAR § 13-75-14(4) provides:

> Aquarium fish collectors with a valid aquarium fish permit issued pursuant to section 188-31, HRS, may use traps and nets for aquarium fish and other aquatic life in conformance with the conditions of the permit, provided that non-commercial aquarium fish collectors shall be limited to a combined total of five fish or aquatic life specimens per person per day[.]

Thus, the alleged "action" at issue here is the "taking of marine or freshwater nongame fish and other aquatic life for

---

[5]    HRS § 343-6 provides, in relevant part:

> **§ 343-6  Rules.**  (a) After consultation with the affected agencies, the council shall adopt, amend or repeal necessary rules for the purposes of this chapter in accordance with chapter 91 including, but not limited to, rules that shall:
>
> . . .
> (2)  Establish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an environmental assessment[.]

[6]    Hawaii Administrative Rules (**HAR**) § 13-77-2 provides, *inter alia*, that:  "'Commercial aquarium fish permit' means a valid aquarium fish permit issued to a person who also has been issued a valid commercial marine license;" and "'Recreational aquarium fish permit' means a valid aquarium fish permit issued to a person for non-commercial use."

aquarium purposes," which is initiated by an applicant's request for an aquarium fish permit. HRS § 188-31(a). Accordingly, it is an alleged "applicant action," potentially subject to HRS § 343-5(e) (Supp. 2015).[7] On appeal, Appellants described the alleged action as the "directed, intentional, large-scale commercial removal under each [p]ermit, and collectively under the dozens of such [p]ermits DLNR issued," but freely acknowledged that they seek an interpretation of HEPA that would apply equally to both recreational and commercial aquarium fish permits.

B.   Applicability of HEPA to Aquarium Collection Permits

Thus, we must examine whether aquarium collection, as described above, is an "action" under HEPA. As noted, HRS § 343-2 provides that "'Action' means any program or project to be initiated by any agency or applicant." The issue of whether aquarium collection pursuant to a DLNR-issued permit constitutes a program or project is a question of statutory interpretation. This court's construction of statutes is guided by the following:

---

[7]     HRS § 343-5(e) states, in relevant part:

(e) Whenever an applicant proposes an action specified by subsection (a) that requires approval of an agency and that is not a specific type of action declared exempt under section 343-6, the agency initially receiving and agreeing to process the request for approval shall require the applicant to prepare an environmental assessment of the proposed action at the earliest practicable time to determine whether an environmental impact statement shall be required; provided that if the agency determines, through its judgment and experience, that an environmental impact statement is likely to be required, the agency may authorize the applicant to choose not to prepare an environmental assessment and instead prepare an environmental impact statement that begins with the preparation of an environmental impact statement preparation notice as provided by rules. . . .

11

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

Haw. Gov't Emps. Ass'n, AFSCME Local 152, AFL-CIO v. Lingle, 124 Hawai'i 197, 202, 239 P.3d 1, 6 (2010) (citation omitted).

Furthermore, a "rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable," inasmuch as "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." Bowers v. Alamo Rent-A-Car, Inc., 88 Hawai'i 274, 277, 965 P.2d 1274, 1277 (1998) (citations, internal quotation marks, and brackets omitted).

Our analysis begins with the plain language of the statute. The definition of "action" under HEPA has not changed since it was first introduced in 1974. 1974 Haw. Sess. Laws Act 246, § 1 at 707. An "action" is "any program or project to be initiated by an agency or applicant." HRS § 343-2. The words "program" and "project" are not defined in HEPA. When a word is not statutorily defined, this court "may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning[.]" Nuuanu Valley Ass'n v. City & Cty. of Honolulu, 119 Hawai'i 90, 98, 194 P.3d 531, 539 (2008) (quoting

Leslie v. Bd. of Appeals of the Cty. of Haw., 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006)) (internal quotation marks omitted). Using a well-accepted dictionary, the Circuit Court defined "program" as "a plan or system under which action may be taken toward a goal" and "project" as "a specific plan or design; scheme or planned undertaking." Clearly, not every activity initiated by an applicant or agency rises to the level of a program or project. The Circuit Court utilized the ordinary meaning of program and project to conclude that "'aquarium collection' does not specifically identify any program or project to review for HEPA purposes."

We also consider a number of Hawai'i appellate court cases that have identified or discussed programs or projects that constitute applicant actions under HEPA.

In Kahana Sunset Owners Ass'n v. Cty. of Maui, 86 Hawai'i 66, 75, 947 P.2d 378, 387 (1997), the Napilihau Villages development project was the "action" for the purposes of HEPA. The Napilihau Villages development project consisted of a 312-unit multi-family residential development on Maui. Id. at 68, 947 P.2d at 380. The Napilihau Villages project also included the installation of a "36-inch drainage line beneath Napilihau Street connecting to an existing 24-inch culvert beneath Lower Honoapi'ilani Highway." Id. at 71, 947 P.2d at 383. The Maui County Planning Commission (MCPC) granted developer JGL Enterprises Inc.'s application for a Special Management Area use permit and concluded that an EA was not required for the Napilihau Villages project. Id. at 68, 947 P.2d at 380.

Pursuant to HEPA, an EA is mandatory unless the "action" is declared exempt under HRS § 343-6. Id. at 71, 947 P.2d at 383. The supreme court determined that the Napilihau Villages project was not exempt under HRS § 343-6. Id. at 72, 947 P.2d at 384. As such, the supreme court ruled, inter alia, that the MCPC had erred in not requiring an EA for a proposal to build the Napilihau Villages project. Id. at 68, 947 P.2d at 380.

In Citizens for Protection of North Kohala Coastline v. Cty. of Haw., 91 Hawaiʻi 94, 104, 979 P.2d 1120, 1130 (1999), the "action" for the purposes of HEPA was the Mahukona Lodge development project. The Mahukona Lodge development project consisted of a "hotel, residential subdivision, 18-hole golf course, tennis facilities, and other related site improvements and infrastructure." Id. at 96, 979 P.2d at 1122. The Mahukona Lodge project also included the construction of two underpasses below a public highway. Id. at 103, 979 P.2d at 1129. The Hawaiʻi County Planning Commission granted Chalon International of Hawaiʻi Inc.'s permit for the development of the Mahukona Lodge project. Id. at 96, 979 P.2d at 1122. The Circuit Court concluded as a matter of law that the Mahukona Lodge project did not fall within the subject category listed in HRS § 343-5(a)(1) and therefore environmental review was not required under HRS Chapter 343. Id. at 97, 979 P.2d at 1123. The supreme court ruled, inter alia, that the two underpasses constituted the "use of State lands" within the meaning of HRS § 343-5(a)(1) and therefore environmental review was "triggered" under Chapter 343. Id. at 105, 979 P.2d at 1131.

In <u>Sierra Club I</u>, 109 Hawaiʻi at 415-16, 126 P.3d at 1102-03, the supreme court held that the reclassification of an agricultural district to an urban district in order to develop the Koa Ridge project constituted an "action" under HEPA. The Koa Ridge project consisted of "thousands of homes, a commercial center, elementary school, park, church/day care, recreation center and the Pacific Health Center." <u>Id.</u> at 413, 126 P.3d at 1100. The Koa Ridge project also involved the installation of sewage and water transmission lines that would "tunnel underneath Kamehameha Highway, the H-1 Freeway, the H-2 Freeway, and Farrington Highway, all of which are State land." <u>Id.</u>

The supreme court noted that under the plain and unambiguous language of the statute, the Koa Ridge project constituted an "action" under HEPA because it is a "project to be initiated by applicants." <u>Id.</u> at 415, 126 P.3d at 1102 (internal quotation marks omitted). The supreme court recognized that the reclassification of land "*in and of itself*, does not trigger" an EA. <u>Id.</u> at 416, 126 P.3d at 1103. However, an EA can be required "at the reclassification stage if one of the triggers set forth in HRS § 343-5(a) applies to the proposed project." <u>Id.</u> The Koa Ridge project proposed the use of "state or county lands" under HRS § 343-5(a)(1) because the construction of the water and sewage transmission lines involved tunneling beneath State highways. <u>Id.</u> at 415, 126 P.3d at 1102. Lastly, no party had asserted that the Koa Ridge project was exempt under HRS § 343-6. <u>Id.</u> at 418, 126 P.3d at 1105. Therefore, an EA was required under HEPA. <u>Id.</u>

In Sierra Club II, 115 Hawai'i at 304, 167 P.3d at 297, the Sierra Club, Maui Tomorrow, Inc., and the Kahului Harbor Coalition challenged the Department of Transportation's (DOT) approval of various harbor improvements and permits associated with the Hawai'i Superferry project. The Hawai'i Superferry was an "inter-island ferry service between the islands of O'ahu, Maui, Kaua'i, and Hawai'i, using harbor facilities on each island." Id. at 305, 167 P.3d at 298. The parties did not dispute that the "harbor improvements-which propose the use of state funds and state lands-are a triggering 'action' under HEPA." Id. at 336, 167 P.3d at 329. The parties disputed DOT's determination that the harbor improvements were exempt from the requirements of HEPA under HRS § 343-6. Id. The supreme court concluded that the DOT's determination that the harbor improvements were exempt from the requirements of HEPA was erroneous as a matter of law. Id. at 342, 167 P.2d at 335.

In Nuuanu Valley Ass'n, 119 Hawai'i at 102, 194 P.3d at 543, the parties did not dispute that the proposed Laumaka subdivision was an action within the meaning of HEPA. The Laumaka subdivision involved the creation of nine large subdivision lots capable of supporting two homes each. Id. The Laumaka subdivision would require the "use of and connection to the county's drainage and sewer systems." Id. at 101, 194 P.3d at 542. The supreme court held, inter alia, that connection to the County's existing drainage and sewage lines did not constitute a use of state or county land and therefore an EA was

16

not required.  Id. at 104, 194 P.3d at 545 (internal quotation marks omitted).

In 'Ohana Pale Ke Ao v. Bd. of Ag., 118 Hawai'i 247, 249-50, 188 P.3d 761, 763-64 (App. 2008), a marine biotechnology firm requested a permit from the State Department of Agriculture to import eight strains of algae to Hawai'i.  The firm intended to "keep and grow the imported algae" at a state site to "demonstrate the feasibility of scaling up their cultures to a capacity of several hundred liters."  Id. at 254, 188 P.3d at 768.  This court noted that the demonstration project constituted an "action" that proposed the "use of state land" and therefore was subject to environmental review.  Id.

The Napilihau Villages, Mahukona Lodge, Koa Ridge project, harbor improvements for the Superferry Project, Laumaka subdivision, and a research program concerning genetically modified algae are examples of projects or programs that constitute "actions" within the ambit of HEPA.  The Circuit Court recognized that in these Hawai'i appellate cases concerning HEPA, the actions at issue involve "specifically identifiable programs or projects."  We agree.  The projects or programs described in these cases also exemplify the essential nature of HEPA's intended reach and that the definition of "action" as "any program or project" - as opposed to, for example, "any activity whatsoever" -  reflects that not every level of regulated activity is meant to be swept into HEPA's reach.  The projects or programs in these cases stand in stark contrast to the activity of aquarium fish collection as

permitted under HRS § 188-31, which includes a parent netting one or two fish from a stream for his or her child's fish tank, as well as larger scale commercial operations. It would be unprecedented to apply HEPA to require individual Hawai'i citizens to undertake the EA process for such an activity. Hawai'i courts have not construed "any program or project" to mean each and every government-regulated activity.

We also consider Appellants' argument in the context of related Hawai'i statutes and regulatory measures, including other individual licenses and permits.

First, in casting HEPA review of individual aquarium fish permits as the intended and necessary means to protect marine life and the reef ecosystem from the "unconstrained removal" of large numbers of aquarium fish, Appellants ignore the panoply of other regulatory tools that are in place. For example, HAR § 13-77-6 sets limits applicable to commercial aquarium fish permit holders in the waters of Oahu, including: limits to the length and height of small mesh nets (HAR § 13-77-6(a)); daily bag limits for yellow tang, kole, moorish idols, and other species (HAR § 13-77-6(b)); size restrictions and other prohibitions (including some complete bans) for yellow tang, kole, cleaner wrasse, certain butterfly fish, and other species (HAR § 13-77-6(c-f)). See also HRS § 187A-5 (2011). Commercial marine licensees (who are the only permittees allowed to take more than five fish per day) are also subject to monthly reporting requirements (HAR § 13-74-20(d)), and their licenses

and permits may be subject to "such conditions [as are] necessary to manage, protect, and conserve aquatic life" (HAR § 13-74-2(4)). See also HRS §§ 189-2, 189-3 & 189-3.5 (2011). By statute and rule, Hawaii's waters include Marine Life Conservation Districts, Regional Fisheries Management Areas (including Fish Replenishment Areas), Shoreline Fisheries Management Areas (including Marine Protection Areas), and Marine Refuges. Hawai'i law provides DLNR with numerous powers and duties to manage aquatic life and resources, comprehensively and systemically, rather than based on a separate environmental review for each fishing permit or license. See generally HRS Chapters 187A (Aquatic Resources), 188 (Fishing Rights and Regulations), 188F (West Hawaii Regional Fishing Management Area), 189 (Commercial Fishing), 190 (Marine Life Conservation Program), and 195D (Conservation of Aquatic Life, Wildlife, and Land Plants). While this extensive statutory and regulatory framework is not dispositive of the issue of whether the activity of aquarium fish collection pursuant to an HRS § 188-31 permit should be construed as a "program or project" under HEPA, we consider the meaning of the HEPA terms in light of other statutes touching upon the issue.

In addition, as argued by *Amicus Curiae* Pet Industry Joint Advisory Council, the State implements numerous other permitting or licensing systems for similar activities. In addition to aquarium fish permits, DLNR's Division of Aquatic Resources issues, *inter alia*, bait fish licenses (HRS § 188-45

(2011)), bottomfishing vessel registrations (HAR § 13-94), commercial marine licenses (HRS § 189-2), freshwater game fish licenses (HRS § 188-50 (2011)), special activity permits (HRS § 187A-6 (2011)), West Hawai'i aquarium permits (HAR § 13-60.4), and permits to enter or conduct activities in certain areas (HAR §§ 13-31 (Molokini Shoal), 13-60.5 (Northwestern Hawaiian Islands Marine Refuge), and 13-62 (Wahiawa Public Fishing Area)). Other DLNR divisions issue various other types of permits and licenses including hunting licenses, camping permits, collecting permits, access permits, commercial activity permits (e.g., beach weddings), commercial harvest permits, and marine event permits (for canoe, surf, swim, body board contests, beach clean up, sailing races, etc.), See generally Department of Natural Resources, www.dlnr.gov (last visited August 26, 2016). Appellants offer no rational distinction or logical reason why HEPA environmental review procedures should be required for aquarium fish permits, but not for these other types of licenses and permits. Nor would this expansive interpretation of "applicant action" be necessarily limited to activities permitted or licensed by DLNR.

An EA must provide a "detailed description of the proposed action or project and evaluate direct, indirect, and cumulative impacts, as well as consider alternatives to the proposed project and describe any measures proposed to minimize potential impacts." Sierra Club II, 115 Hawai'i at 307, 167

P.3d at 300 (emphasis added) (citation omitted). Cumulative impact is defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

HAR § 11-200-2. Therefore, among other things, each individual permit applicant would have to evaluate the cumulative impact of aquarium collection under all issued permits in his or her preparation of an EA.

We conclude that to interpret "program or project" so sweepingly as to require individual aquarium fish permit applicants to undertake the EA process is not a "rational, sensible and practicable interpretation" of HEPA and would create an unreasonable, impractical, and absurd result. See Bowers, 88 Hawai'i at 277, 965 P.2d at 1277. Accordingly, we hold that aquarium collection under an aquarium fish permit issued by DLNR pursuant to HRS § 188-31 is not an "applicant action" under HEPA.

C.  The DLNR's Exercise of Discretion

DLNR also argues that, even if aquarium collection fell within the definition of an "applicant action," it is not subject to HEPA because there is no discretionary agency approval of aquarium fish permits. This argument is without merit.

21

Pursuant to HRS § 343-5(e), an EA is required only when an applicant proposes an "action" that requires approval of an agency. "Approval" is defined as "discretionary consent required from an agency prior to actual implementation of an action." HRS § 343-2. "Discretionary consent" means "a consent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from ministerial consent." Id. "Ministerial consent" means "a consent, sanction, or recommendation from an agency upon a given set of facts, as prescribed by law or rule without the use of judgment or discretion." HAR § 11-200-2.

DLNR argues that it has no discretion as to whether or not to issue an aquarium fish permit because the application process is online and completely automatic. In other words, if an applicant fills in the online form and clicks the box accepting the "terms and conditions," an aquarium fish permit is issued. As Appellants argue, however, by its plain language, HRS § 188-31 gives DLNR discretionary authority over whether to approve a aquarium fish permit, stating that DLNR "may issue an aquarium fish permit" (HRS § 188-31(a)), and stating that DLNR must be satisfied that certain requirements are met, i.e., that "permits shall be issued only to persons who can satisfy [DLNR] that they possess facilities to and can maintain fish and other aquatic life alive and in reasonable health" (HRS § 188-31(b)). The online form, including the applicant's representation that specified conditions are met, is simply the means by which DLNR

22

has determined to exercise its discretion. The legislative history of HRS § 188-31 makes DLNR's discretionary authority clear, stating, *inter alia*, that the statute was "designed to permit the establishment of such an aquarium fishing industry and provides safeguards so that the abuse of the privilege of using fine mesh nets can be prevented." H. Stand. Comm. Rep. No. 586, in 1953 House Journal, at 675. HRS § 188-31(c) provides that DLNR may adopt rules for the purpose of the statute, suggesting that the Legislature intended that DLNR would have ample means with which to exercise its discretion. Accordingly, we reject DLNR's argument that a lack of discretionary approval provides a separate ground for denying Appellants' requested relief.

V. CONCLUSION

For these reasons, the Circuit Court's Summary Judgment Order and Judgment, both filed on June 24, 2013, are affirmed.

On the briefs:

Paul H. Achitoff,
Summer Kupau-Odo,
(EarthJustice),
for Plaintiffs-Appellants.

William J. Wynhoff,
Deputy Attorney General,
for Defendant-Appellee.